## Fourth Court of Appeals
### San Antonio, Texas


### MEMORANDUM OPINION

No. 04-12-00768-CR

Anthony **GONZALES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Frio County, Texas
Trial Court No. 11-05-00079-CRF
Honorable Donna S. Rayes, Judge Presiding

Opinion by: Marialyn Barnard, Justice

Sitting: Catherine Stone, Chief Justice
Marialyn Barnard, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: March 12, 2014

AFFIRMED

A jury convicted appellant Anthony Gonzales of arson. The trial court sentenced Gonzales

to ten years confinement. On appeal, Gonzales contends the evidence was legally insufficient to

support his conviction. We affirm the trial court's judgment.

### BACKGROUND

In the early morning hours of December 11, 2010, officers from the Pearsall Police

Department were dispatched to a mobile home fire. When Sergeant Jeremy McGhee arrived,

smoke and fire were coming from the interior of a mobile home. Sergeant McGhee testified that

when he arrived, Vidal and Criselda Martinez were at the front of the home, using a garden hose in an attempt to extinguish the fire. Sergeant McGhee followed Vidal to the back of the home and at that time he saw Gonzales. According to the sergeant, Gonzales was "screaming, yelling that his girlfriend was in the residence." The sergeant stated Gonzales seemed distraught, crying and yelling. Sergeant McGhee stated he went back to the front of the residence, but could not enter because flames were blocking his way. The sergeant went to the window of a back bedroom where he had been told by Gonzales and Criselda that the girlfriend could be found. The sergeant could not see anything inside because of the smoke.

According to Sergeant McGhee it was about this time that he was approached by Gonzales who told him that Gonzales and his girlfriend, later identified as Josephine Cantu, were "having kinky sex in the bedroom," but he smelled smoke coming from the kitchen so he left the home and went to Vidal's residence for help. According to the sergeant, Gonzales advised that Cantu was handcuffed to the bed. It was around this time that firefighters arrived.

Sergeant McGhee told firefighters about Cantu. Firefighters began to extinguish the fire. After firefighters put out the fire, Sergeant McGhee was told a body had been found inside the mobile home. The sergeant called a police lieutenant and a captain, who subsequently arrived at the scene. Sergeant McGhee took Gonzales to the Pearsall Police Department to obtain more information about Cantu and the events leading up to the fire. According to the sergeant, Gonzales had burns on his nose and lips, and there was "a strong odor of alcohol emitting from his person and breath."

Based on information obtained from Gonzales and his aunt, who had accompanied Gonzales to the police station, Sergeant McGhee was able to positively identify the victim as Cantu. As the sergeant was taking down information relevant to the identification, Gonzales began to tell the sergeant, again, what had happened at the mobile home. According to Sergeant McGhee,

Gonzales told him that Gonzales and Cantu were having "kinky sex" in the bedroom, and as part of it, he handcuffed Cantu to the bed. At some point, Gonzales smelled smoke "emitting from the kitchen" and went to check on it. Gonzales stated the kitchen was on fire so he grabbed a trash can and ran to the bathroom to get water to put out the fire. Unable to extinguish the fire, Gonzales told Sergeant McGhee that he left and went to Vidal's home for help. Gonzales claimed "he did not have a cell phone on him at that time. That's the reason he went over there to get help."

With regard to the cause of the fire, Gonzales told the sergeant he "had been having problems with the electrical breaker and they kept on having to reset the breaker." Sergeant McGhee advised the jury that while firefighters were attempting to extinguish the fire, he noticed the front porch light was on, so he called to have the electricity turned off. After Gonzales signed a consent to search form, he and his aunt were taken by another officer back to the mobile home.

Sergeant Louis Farias, who arrived at the mobile home at the same time as Sergeant McGhee, testified next, and his testimony essentially mirrored that of Sergeant McGhee. When Sergeant McGhee took Gonzales to the police station, Sergeant Farias stayed at the scene, taking photographs. Sergeant Farias testified the subsequent investigation was conducted by, among others, Texas Ranger Shane Staley and Mitch Wilson of the Nueces County Fire Marshall's Office.

When Lieutenant Pedro Omar Salinas arrived at the mobile home, he spoke with Gonzales. Gonzales again relayed the "kinky sex" story. However, according to Lieutenant Salinas, Gonzales stated that after he handcuffed Cantu to the bed, he went to the restroom and when he came out, he saw the *bedroom* was on fire. The lieutenant said Gonzales admitted he panicked, grabbing a trashcan and filling it with water in an attempt to douse the flames in the bedroom. When this did not work, Gonzales ran out of the house. Later, Ranger Staley arrived on the scene, and obtained consent to search the home. After that, Lieutenant Salinas stated he and Ranger Staley entered the mobile home.

The lieutenant said they found Cantu's body in a narrow hallway outside the utility room, south of the kitchen. The handcuffs she had been wearing were broken. In the master bedroom they saw burned flooring, a king or queen-size bed with one corner burned by the bed post. Lieutenant Salinas also said they saw "a fuel can, like a gas type can, red in color right by where this burned area of the bed — portion of the bed was." He also noticed the shower was on. He said Gonzales had mentioned filling a trash can with water in an attempt to extinguish the fire. Numerous items were taken from the home, including the gas can, Cantu's clothes that were found on the bed, a partial handcuff found near Cantu's body, and a gas cap found on the bed rail of a truck in the backyard.

The State next called Ranger Staley to the stand. Ranger Staley conducted several interviews with Gonzales. The first one took place at the scene of the fire, and others took place at the police station. As he had with the other officers, Gonzales told Ranger Staley what happened the night of the fire. According to the ranger, Gonzales said he and his girlfriend, Josephine Cantu, had been at his aunt's house earlier in the evening and they had been drinking — it was later determined Cantu had an alcohol level more than twice the legal limit for driving. Gonzales also stated that he and Cantu had each done about two lines of cocaine. According to Ranger Staley, Gonzales said he and Cantu then went to the mobile home for "kinky sex."

Gonzales told the ranger he handcuffed Cantu to the bed post with "novelty" handcuffs. The cuffs were separated when Cantu's body was found, leading the defense to suggest Cantu was not dead when the fire started, as the State claimed. However, Ranger Staley opined the handcuffs could have broken during a struggle between Gonzales and Cantu, or perhaps when Gonzales dragged Cantu's body out of the bedroom and into the hallway. The defense also noted a metal link from a chain, perhaps from a handcuff chain, was found in the bedroom suggesting Cantu

broke free of the handcuffs. However, Ranger Staley testified the link found in the bedroom did not appear to be a link from the handcuffs found on Cantu's body.

Originally, Gonzales told Ranger Staley that Cantu was handcuffed above her head around the bed post. In the later interview, he claimed Cantu was standing at the foot of the bed with her hands cuffed behind her back. According to Gonzales, after he cuffed Cantu, he went into the bathroom. He said both he and Cantu were fully dressed when he went to the bathroom. This statement is contrary to testimony from Lieutenant Salinas and Ranger Staley that they found Cantu's clothes — her jeans and rhinestone belt —on the bed. Cantu was not wearing any clothing from the waist down when her body was discovered. Gonzales could not explain the discrepancy other than to claim he could not remember.

Gonzales told Ranger Staley that when he came out of the bathroom, the bedroom was engulfed in flames. Gonzales claimed, as he had before, that he grabbed a trash can from the bathroom, turned on the shower, filled the trash can with water, and tried to extinguish the fire. Gonzales told the ranger he filled the trash can four or five times. Gonzales said he was unable to put out the fire so he ran out of the home, through the smoke and fire, home to his uncle's house for help. Ranger Staley testified he saw no burns on Gonzales other than around his nose and mouth. Gonzales stated that when he got to his uncle's house, he told his uncle to call 911 — Gonzales said he did not know where his cell phone was — and together they went back to the house and attempted to put out the fire with the garden hose.

Gonzales also told Ranger Stalely that when he came out of the bathroom, the smoke was very thick and that he could not see from the bathroom to the bed. When he left, he had to run through the smoke and fire to get out. He did not see Cantu. Gonzales stated he was unaware Cantu had not gotten out until he returned and attempted to put the fire out. However, at the police station, Gonzales said he heard Cantu scream and yell when he was attempting to put out the fire

with the bathroom trash can. When he did not hear her anymore, he assumed she got out. Gonzales could not explain how Cantu escaped the handcuffs and got out of the bedroom to the hallway where her body was found.

Ranger Staley also inquired about Gonzales's exit from the residence. Gonzales stated he ran from the back bedroom, through the hall, into the kitchen and out the front door. The ranger asked Gonzales why he left through the front door when the back door, which was to the left of the bedroom, would have been the quickest exit. Gonzales responded that the door was normally dead bolted and he had trouble opening it, so he ran out the front.

Ranger Staley told the jury he saw a large kitchen table blocking the path from the hallway into the kitchen — you would have to turn sideways to get by. Ranger Staley asked Gonzales if he typically had to turn sideways to get around the large table and Gonzales responded that he did. When asked how he navigated past the table through the smoke during the fire, Gonzales stated he must have jumped over it. Gonzales could not explain how he failed to see or trip over Cantu's body when he fled the mobile home if, in fact, Cantu had escaped from the bedroom as he suggested.

The ranger also asked Gonzales how he believed the fire started to which Gonzales replied, as he had before, that he had been having trouble with the electrical box. However, two officers testified the electricity was still on during the fire. The ranger told Gonzales the fire was not an accident and it was started with diesel fuel in three separate places in the home. Gonzales denied starting the fire. When the ranger told Gonzales they found diesel fuel on his pants, he stated it must transferred from his hand to his pants after he carried the gas can into the house.

Ranger Staley also examined the inside of the mobile home. In the master bedroom, Staley noted that the door to the bathroom could not be shut completely and that the shower was still running. In the master bedroom, he saw a "burned spot" between the bed and the dresser that went

through the carpet to the wooden flooring. Next to the burn spot was a gallon-size gas can. When Staley asked Gonzales about the gas can, which contained diesel fuel, Gonzales simply stated he kept it there to keep it from being stolen. He said he tried to hide everything he could to prevent items from being stolen. Gonzales said he did not realize he placed the gas can in the bedroom. However, Staley observed a tool shed on the outside premises that contained various items he deemed more valuable than the gas can. Gonzales said he did not put the gas can in the tool shed because he was walking into the house and just carried it in with him.

Gonzales told Ranger Staley he and Cantu had a good relationship. He said they argued at times, but not on the night of the fire. Gonzales admitted hitting Cantu in the past, but denied attempting to choke or strangle her. Ranger Staley suggested Gonzales killed Cantu and set the house on fire because Cantu was tired of the abuse and intended to leave — explaining why most of Cantu's belongings were thrown into the bed of her truck.

Gonzales told the ranger Cantu was seeing a psychiatrist, which her family confirmed. The ranger admitted Cantu had trouble with drugs and alcohol, specifically a long-term problem with cocaine, and had previously gone to a facility for treatment. The defense presented evidence Cantu was on probation for the offense of injury to a child.

The State also called witnesses from the Texas State Fire Marshal's Office ("TSFMO"). The first to testify was David Rives, a canine handler with the TSFMO. Rives stated his job was to run an "accelerant detection canine" through fire scenes to determine if "ignitable liquids are present." Rives told the jury that if a dog detected the odor of an accelerant he was trained to detect, which included diesel fuel, the dog would sit and stare at the area from which the odors are emanating. If the dog alerted, Rives would then collect samples for testing.

Rives was asked to help with the mobile home fire, and brought a dog to the scene. Rives instructed his dog to search the mobile home. The dog alerted to a liquid inside the gas can found

in the bedroom and to an area on the floor of the bedroom. Rivas took samples from these two areas and took them to the laboratory at the State Fire Marshal's Office in Austin, Texas.

The State also called Mitchell K. Wilson, a fire arson investigator with the TSFMO. Investigator Wilson testified he was asked to investigate the fire at the Gonzales mobile home. He told the jury that based on the exterior damage, the fire had moved into the hallway and it was likely the fire had started in more than one location. Once inside, the investigator first found fire damage in the kitchen/dining room area. The damage led him to determine the fire moved from the floor area of the wall to the ceiling. He noted the ceiling south of this area was intact. Investigator Wilson also examined the utility room and found a pile of burned clothes on top of the dryer — everything else in the utility room was intact. He then went to the master bedroom and noted the "fire burn" on the carpet beside the footboard of the bed. The fire in this area burned up onto the mattress, but did not consume the bed. The entire floor was not consumed, only a three by four foot area was "charred." These three locations were the only places in the home that had indications of burns from a fire.

Investigator Wilson concluded that because there was "no communication" between the three burn areas, i.e., one fire did not lead to another, there were three separate fires set in the home. He told the jury that based on his observations and the results from the testing on the items from the trailer, an ignitable liquid was used to start the three fires, and that an open flame was the source of ignition. The ignitable liquid was determined to be fuel oil, which includes diesel.

Investigator Wilson also ruled out other causes for the fires — accidental or electrical sources. He admitted he could not determine which of the fires started first, in what order the fires were started, who lit the fires, or how long each fire lasted.

Emerald Nazareno, a forensic scientist with the State Fire Marshal's Arson Laboratory, ran tests to determine what type of fuel was contained in the gas can found inside the bedroom. Tests

determined the can contained fuel oil. Ms. Nazareno told the jury that testing revealed the presence of fuel oil on Gonzales's jeans, Cantu's clothing, and Cantu's body. Alkanes, which are "specific hydrocarbons in ignitable liquid residue," were found in Cantu's hair. Ms. Nazareno could not say the alkanes, which are also considered ignitable liquids, were from fuel oil because there were insufficient hydrocarbon chains.

The State then presented testimony from Dr. Randall Frost, the Chief Medical Examiner for Bexar County. He testified he conducted the autopsy on Cantu. Dr. Frost first testified that based on the autopsy, he could not say Cantu had suffered any physical trauma. As for the impact of the fire, he found no soot in her lower wind pipe or bronchia leading into the lungs. Dr. Frost stated this suggested she was dead at the time the fire started. Dr. Frost said his opinion that Cantu was dead before the fire started was also supported by the low amount of carboxyhemoglobin levels in Cantu's blood. The doctor explained that carboxyhemoglobin levels reflect how much carbon dioxide is inhaled during a fire. When a high amount of carboxyhemoglobin levels are found, it indicates that an individual is alive and breathing during a fire. Cantu's levels were extremely low — four percent, a negligible level. Dr. Frost also explained a typical person has roughly a ten to fourteen percent range of carboxyhemoglobin in the blood from living in the modern world where there is pollution and combustion. The doctor concluded that at the time of the fire, Cantu was not breathing and was therefore not alive.

Dr. Frost stated he smelled fuel on Cantu's body, but admitted he could not determine the cause of death. However, he could not rule out asphyxia as the cause of death. Dr. Frost stated he did not believe carbon monoxide caused the asphyxia given the levels in Cantu's blood, but that it was more likely some sort of traumatic asphyxia.

On cross-examination, Gonzales suggested to Dr. Frost that perhaps Cantu died from a drug overdose, given her history with cocaine and her enlarged heart, or perhaps she set herself on

fire, i.e., self-immolated, given her alcohol level and mental condition. Dr. Frost admitted he could not rule out either as the cause of death.

Dr. Frost's results were disputed by Dr. Suzanna Dana, a forensic pathologist called as a witness by Gonzalez. Dr. Dana reviewed autopsy photographs and other relevant documentation. She concluded Cantu was alive at the time the fire started. Dr. Dana stated the amount of soot in the airway, the photographs, and the absence of any pre-fire cause of death lead her to conclude Cantu was alive when she began to burn. The doctor opined that the only way Cantu could have had soot in her airway was if she was breathing at the time of the fire. She specifically stated that she did not believe "you can get soot in the airway if you are dead during a fire." Dr. Dana advised that she had previously seen findings like those uncovered during the autopsy in cases of: (1) self-immolation — where someone sets herself on fire, purposefully or accidentally; or, (2) in automobile accidents involving "instantaneous type of fire."

The State concluded by calling members of Cantu's family as witnesses. First to testify was Rhonda Gonzales, one of Cantu's adult daughters. Rhonda testified Gonzales was her mother's boyfriend and that the relationship caused tension between mother and daughter. Rhonda said she was living with her mother in Gonzales, Texas, but her mother moved out of their home and into the home of Gonzales in Pearsall. However, on December 7, 2010, a few days before her death, her mother moved back to Gonzales, Texas. Rhonda spoke to her on the phone the night Cantu moved back and she also spoke to Gonzales. According to Rhonda, Gonzales told her he would not hurt her mother anymore, he was "sorry for the bruises on [Cantu's] arms," and that Cantu could come back and live with him in Pearsall.

The State's final witness was Cantu's mother, Maria Gonzales. She also spoke to Cantu and Gonzales on the phone shortly before Cantu's death. Maria told the jury Gonzales told her

Cantu was not coming home and she would never see her again. That was the last time she spoke to her daughter.

After Maria Gonzales testified, both sides rested and closed. After hearing closing arguments and the reading of the charge, the jury retired to deliberate. Ultimately, the jury found Gonzales guilty of arson and he was sentenced to ten years confinement. Gonzales then perfected this appeal.

**ANALYSIS**

In a single issue, Gonzales challenges the sufficiency of the evidence to support his conviction. Specifically, Gonzales contends the evidence is insufficient to prove he set the mobile home on fire. Gonzales points out there were two people were inside the trailer when the fire started, and therefore it was just as likely Cantu set the fire and then died from an unknown cause.

***Standard of Review***

The Supreme Court announced the standard for reviewing legal sufficiency challenges in *Jackson v. Virginia. Brooks v. State*, 323 S.W. 3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2012, pet. ref'd). Thus, we review Gonzales's sufficiency complaint under the standards set forth in *Jackson v. Virginia.*

Under the legal sufficiency standard, the evidence is evaluated by the reviewing court in the light most favorable to the verdict in an attempt to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Poindexter v. State*, 153 S.W.3d at 899. Under this standard, deference is given to the jury's weighing of the evidence, assessment of credibility, and resolution of conflicts in the testimony. *Brooks*, 323 S.W.3d at 899). The jury verdict will be affirmed unless it can be found that a

reasonable juror would have had a reasonable doubt about one of the elements of the offense. *Laster v. State*, 275 S.W. 3d 512, 517 (Tex. Crim. App. 2009).

The legal sufficiency standard requires an appellate court to resolve any inconsistencies in the testimony in favor of the verdict. *Gonzales v. State*, 330 S.W.3d 691, 694 (Tex. App.—San Antonio 2010, no pet.) (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)). Thus, in analyzing the legal sufficiency of the evidence, this court must determine whether the necessary inferences are reasonable based on the combined force of the evidence, direct and circumstantial, when viewed in the light most favorable to the verdict. *Mayberry*, 351 S.W.3d at 509 (citing *Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (holding standard of review is same for both direct and circumstantial cases).

It is important to remain mindful that an appellate court cannot reweigh the evidence or substitute its judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Any, all, or part of a witness's testimony may be accepted or rejected by the jury. *Id.* The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts; and it is their sole province to reconcile any evidentiary conflicts. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.).

### *Application*

As noted above, Gonzales argues the State failed to prove he started the fire. More specifically, Gonzales argues the State failed to establish beyond a reasonable doubt that he, rather than Cantu, started the fire. He points out that his expert testified Cantu was alive when the fire

started. Thus, Gonzales concludes the evidence is legally insufficient to support his conviction. We disagree.

It is undisputed that at the time of the fire Gonzales and Cantu were the people in the mobile home. Dr. Frost testified, based on his autopsy findings, Cantu was dead when the fire started. Although his opinion was contradicted by Gonzales's forensic pathologist, the conflict on this issue was for the jury to resolve, and it clearly resolved the issue in favor of Gonzales's guilt. *See Heiselbetz*, 906 S.W.2d at 504; *Welch*, 993 S.W.2d at 693. Thus, given that there were only two people in the home at the time the fire started, if the jury believed Dr. Frost, as they were entitled to, it could have found Gonzales guilty as he was the only living person in the house when the fire started.

There was, however, more evidence the jury could have relied upon in making its determination. Officers found a can of diesel fuel in the bedroom. Diesel fuel was found on Gonzales's jeans, Cantu's clothing, and Cantu's body. Dr. Frost smelled fuel on Cantu's body. Gonzales told Ranger Staley he kept the can of diesel fuel in the bedroom to prevent it from being stolen. Ranger Staley noted there was a tool shed outside the trailer that contained items higher in value than the can of diesel.

Gonzales stated Cantu was fully clothed when he left the bedroom, yet her jeans and belt were found on the bed after the fire. Gonzales changed his story about how Cantu was handcuffed to the bed. In addition, there was testimony that would have allowed the jury to believe Gonzalez had previously abused Cantu and she was going to leave him the night of the fire.

Given this evidence, plus that set forth in detail above, we cannot say the evidence is legally insufficient. There was sufficient evidence from which the jury could have reasonably inferred that despite his protestation, Gonzales set the fire. Although there were some inconsistencies in the evidence, we must resolve them in favor of the jury's verdict. *See Gonzales*, 330 S.W.3d at

694. Accordingly, viewing the evidence in the light most favorable to the verdict and leaving credibility determinations to the jury, we hold the evidence is legally sufficient to support the arson conviction.

## CONCLUSION

Based on the foregoing, we overrule Gonzales's sufficiency challenge and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish